# DUTCHER v. JACKSON.

PATENTS; INTERFERENCE; CONCEALMENT; INVENTION.

In an interference involving an improvement in railway torpedoes, priority
   of invention was awarded the senior party on a review of the evi-
   dence which showed that he, alone and without capital, had sucess-
   fully placed his invention on the market and had applied for his
   patent within a few months after conception, while the junior party,
   who had conceived the invention and made a device embodying it
   several years before, had suppressed and concealed it for five years
   for business reasons, although backed by a company having ample
   capital and engaged in the business of manufacturing and selling
   railway torpedoes, and was led to file his application only by what
   the senior party had done. (Following *Mason* v. *Hepburn*, 13 App.
   D. C. 86; *Dieckmann* v. *Brune*, 37 App. D. C. 399; and *Brown* v.
   *Campbell*, 41 App. D. C. 499.)

No. 1017. Patent Appeals. Submitted January 18, 1916. Decided February
                         7, 1916.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference proceeding.          *Affirmed.*

The facts are stated in the opinion.

*Mr. A. S. Pattison* for the appellant.

*Mr. Charles H. Howson* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

Appeal from concurrent decisions of the Patent Office tri-
bunals in an interference proceeding awarding priority of in-
vention to George B. Jackson, the senior party.
    The invention relates to a railway torpedo which formerly
was composed of two parts, the torpedo itself and the device by

which it was affixed to the rail. The structure of the issue is composed of but one part, the middle portion holding the explosive and the ends forming the means of attachment to the rail. The improvement is very simple but important. The counts read as follows:

"1. A torpedo comprising a tubular container for explosives, the ends of the container being of sufficient length to embrace the head of a rail, said. ends forming clamping means whereby the torpedo may be secured to said rail head.

"2. An improved railway torpedo . comprising a one-piece tubular metallic explosive-containing case having integral extended ends forming means whereby the torpedo may be clamped to the head of a rail."

Jackson, when he made this invention in April of 1909, was a young man without capital or financial backing. Nevertheless, he immediately procured in the open market collapsible lead tubes with which to manufacture his device, and actually delivered a quantity of his torpedoes to a railway company as early as August, 1909. This initial sale was followed by others, and on January 27, 1910, he filed his application for patent. By the time Frank Dutcher had filed in June, 1911, Jackson had sold between seven and ten thousand gross of torpedoes to fifty different railroads. At the time of the taking of Jackson's testimony, he had sold nearly one hundred thousand gross, or nearly fourteen and one-half millions of torpedoes.

Jackson's attitude presents a sharp contrast to that of Dutcher, who had been engaged in the manufacture of railway signals for many years, and for several years had been superintendent of the Versailles Railway Signal Company, of Versailles, Pennsylvania, a branch of the Central Railway Signal Company, which appears to be the largest concern of its kind in the country. At the time he testified, Mr. Dutcher stated that for fourteen years previously he had engaged extensively in devising signal torpedoes and the like and machinery for manufacturing the same, and had taken out "a great number of patents of railway signal torpedoes."

Early in 1906 Mr. Dutcher made and tested a torpedo em-

bodying the issue, but, owing to the thickness of the lead of which it was constructed, it could not be put to commercial use. The two principal reasons for this were that, upon the detonation of the torpedo, the flying portions of lead might injure bystanders, and that the expense of manufacture would be prohibitive. Mr. Dutcher's company was fully cognizant of what he had done; and, while there is no direct testimony that it was to be the beneficiary of any improvements he might make, it is apparent from the record that such was the fact, for he testifies that he left it entirely with the company to procure sheet lead of the desired thickness and uniformity from which commercial torpedoes embodying his invention could be manufactured. There is testimony of sporadic and unsuccessful attempts to procure this material, and also that at about the time of Jackson's entry into the field Dutcher constructed a very crude roller for the purpose of rolling lead. This roller, however, amounted to nothing, as must have been expected by a man of Mr. Dutcher's wide knowledge in this art. As previously stated, Jackson's device went upon the market in August of 1909, and the sales manager for the Central Railway Signal Company admitted that it must have come to the attention of his company soon thereafter. It is a significant fact that when the success of Jackson's device became assured, Mr. Dutcher's company had no difficulty in procuring lead foil of the requisite thickness and uniformity, although it has not manufactured single-piece torpedoes. After an unsuccessful attempt by Mr. Dutcher to purchase Jackson's invention, he filed his application.

Each of the Patent Office tribunals refused to accept Mr. Dutcher's 1906 device as a reduction to practice, but we shall assume without discussion that the tests made of this device sufficiently demonstrated its utility, and that nothing remained to be done of an inventive character; in other words, that, had Mr. Dutcher's company really desired to place the device upon the market, it could have done so merely by supplying its manufacturing department with the proper material. But this assumption in no way helps Dutcher here. His company was

doing a large business in this line. So far as appears, it practically had possession of the market. That it could have given this invention to the public within thirty days from the time Mr. Dutcher demonstrated its utility early in 1906 had it so desired, we think is beyond question. Its reasons for not doing so are equally clear. Unless and until business expediency demanded, it did not intend to place the improved device before the public. And, inasmuch as its policy was to be Mr. Dutcher's policy, it is apparent that his rights here are dependent thereon. To rule that because of the evidence concerning the attempts to procure material with which to manufacture the device during the five years which intervened between the reduction to practice of this very simple invention and the filing of his application amounted to such activity as to prevent a finding of deliberate concealment and suppression would be to reward subterfuge and accept shadow for substance. The facts of each case, and not an abstract rule of law, must determine our decision. An impartial view of the facts of the present case irresistibly leads to the conclusion that Mr. Dutcher's discovery was deliberately suppressed and concealed from the public for business reasons, and that the public is solely indebted to Jackson for the invention. In other words, we are unable to escape the conclusion that but for Jackson the Dutcher discovery would have lain dormant in the archives of the company. Jackson, alone and without capital, successfully placed his invention upon the market, and applied for his patent within a few months from the date of his conception; Dutcher, with the backing of a company having ample capital and engaged in this very business, delayed the filing of his application five years, and even then was led to file by reason of what his adversary had done. That measure of good faith which the law requires is lacking. The so-called activity of Dutcher was a mere sham, and will not prevent the true inventor from being recognized. Our conclusion is fully warranted by the decisions of this court. *Mason* v. *Hepburn,* 13 App. D. C. 86; *Dieckmann* v. *Brune,* 37 App. D. C. 399; *Brown* v. *Campbell,* 41 App. D. C. 499.

　　The decision is affirmed.　　　　　　　　　　*Affirmed.*